***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Garner. The appealing party has shown good grounds to reconsider the evidence; therefore, the Full Commission REVERSES the decision of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction of the parties and of the subject matter.
3. All parties have been properly designated, and there is no question as to misjoinder or nonjoinder of parties.
4. Plaintiff alleges that he sustained a compensable injury by accident on or about January 19, 2001.
5. Plaintiff's average weekly wage was $721.72 resulting in a compensation rate of $481.17 per week.
6. An employment relationship existed between the plaintiff-employee and the defendant-employer on January 19, 2001.
7. The depositions of Dr. Joseph J. King and Dr. Douglas Burch, D.C. are a part of the evidentiary record in this case.
 ***********
Based upon the evidence of record, the Full Commission finds as follows:
 FINDINGS OF FACTS
1. At the time of the deputy commissioner hearing in this matter, plaintiff was sixty-two (62) years old. Plaintiff was employed as a truck driver with defendant-employer from April 1, 2000 until January 19, 2001. Plaintiff's job duties also included loading and unloading trucks.
2. On January 19, 2001, at approximately 4:00 pm, plaintiff went to a medical appointment with his family physician, Gary Henry, M.D., regarding his blood pressure. Plaintiff's supervisor, Tom Stegall, Sr. took him to this appointment which had been scheduled approximately thirty (30) days prior thereto. At this appointment, Dr. Henry diagnosed plaintiff with bursitis in his right shoulder and gave him samples of Vioxx 25 mg. At this time, Dr. Henry did not restrict plaintiff from working or make a return appointment for plaintiff for continued treatment of his right shoulder ailment.
3. Shortly following the appointment with Dr. Henry, plaintiff returned to work with defendant-employer. Plaintiff had backed his truck up to the loading dock to be loaded and once loaded, he had pulled the truck away so that he could close the doors and go to the scale in order for the load to be weighed. At this time, plaintiff noticed that the load locks on the trailer were not in place. Plaintiff pulled himself up into the trailer using the drainpan on the floor and put the load locks in place. Plaintiff then attempted to exit the trailer and placed his hands, right hand above left hand, on the vertical bar located on the outside of the left trailer door in order to step down off the back of the truck and onto the ICC bumper. The door, however, was not latched, and it swung open when plaintiff grasped the bar with both hands, hyperextending his right arm which may have actually been caught between the bar and the trailer, as evidenced by the laceration to the lateral aspect of the ring finger on the right hand. Plaintiff was left dangling in the air by his right arm until his weight flipped him around and caused him to fall several feet to the concrete below. Plaintiff landed on his left side and sustained injuries to his left side, ribs, left shoulder, right shoulder, cervical spine, and thoracic spine. The fall was so severe that plaintiff did not know whether he had been knocked unconscious or exactly how he had landed. Plaintiff experienced excruciating pain immediately following the fall.
4. Plaintiff had no complaints of neck pain, low back pain, bilateral shoulder pain or numbness or weakness in both hands prior to January 19, 2001.
5. On January 20, 2001, plaintiff sought treatment at the emergency room at Union Regional Medical Center. Plaintiff presented with complaints of rib pain and low back pain. X-rays taken of plaintiff's left ribs and chest revealed no fractures; however, there was a left basil atelectasis indicated on the chest x-ray. Plaintiff was discharged to return home with medication and instructions to follow up with his family physician.
6. On January 22, 2001, plaintiff sought additional treatment with Dr. Gary Henry, his family physician. Plaintiff presented with complaints of rib and back pain and headaches. Plaintiff was given medication with instructions to use moist heat for rib and back pain and to return on January 24, 2001 for a follow-up appointment.
7. On January 24, 2001, plaintiff returned to Dr. Henry with complaints of pain in the left shoulder blade with numbness radiating down his left arm, left-sided neck pain, rib pain and headaches. Dr. Henry then referred plaintiff to Dr. Joseph King, orthopedic surgeon with Carolina Bone and Joint.
8. Dr. Joseph King began treating plaintiff on January 24, 2001. Plaintiff presented to Dr. King with complaints of rib pain, left scapular pain, low back pain, numbness in back, numbness in left shoulder, neck pain and headaches accompanied by sharp pain, and right shoulder pain that plaintiff felt was unrelated to the January 19, 2001 incident. Plaintiff's back x-rays revealed possible wedging at T-12 with anterior spurring at C-4 and thoracic degenerative changes. Dr. King diagnosed plaintiff with thoracic, cervical and rhomboid strain and referred him to physical therapy. Dr. King's opinion was that plaintiff' symptoms were caused or aggravated by his January 19, 2001 fall at work.
9. Dr. King placed plaintiff on light duty restrictions, specifically restricting plaintiff's lifting and driving beginning January 24, 2001 until September 11, 2001. Dr. King did not give specific work restrictions to plaintiff on September 11, 2001 as reflected in plaintiff's medical records. However, Dr. King stated during his deposition that as of September 11, 2001, plaintiff's permanent light duty work restrictions consisted of no arm activity above shoulder level and no lifting greater than twenty-five (25) pounds.
9. Defendants filed a Form 63 Notice to Employee of Payment of Compensation Without Prejudice to Later Deny Claim on February 1, 2001 and weekly temporary total disability compensation payments of $500.03 per week commenced retroactively to January 20, 2001.
10. Plaintiff returned to Dr. King on February 7, 2001 with continuing complaints of neck, low back, rib and right shoulder pain. Dr. King ordered a total body bone scan of plaintiff to determine the possibility of rib fractures and an MRI of plaintiff's right shoulder to check for a torn rotator cuff. Both of these exams were performed on February 16, 2001.
11. Dr. King found that plaintiff's bone scan revealed the following: multiple rib fractures on the left with the lowest fracture within the ninth rib and the highest fracture within the first rib and moderate uptake within the right humeral head with suggestion of possible fracture. Dr. King testified that rib fractures are painful because breathing causes them to move and this type of pain is frequently a preoccupying type of severe pain. The increased uptake on plaintiff's bone scan in the right humeral head suggested extra activity in bone and shoulder, which can be indicative of an injury but is not indicative of bursitis. The possibilities for the cause of the increased uptake were fracture, bone bruise, arthritis, tumor or an infection.
12. Dr. King found that the MRI scan of plaintiff's right shoulder showed extensive degenerative changes in the acromioclavicular joint, large inferior spurring of that joint, which caused some impingement, and a tear of the front lip of the shoulder joint. The overextension and pulling of the right arm when plaintiff was hanging onto the bar on the back of the left trailer door is the type of activity that would have caused the tear to the front lip (labrum) of the shoulder joint.
13. Defendants denied plaintiff's claim on March 16, 2001 via a Form 61.
14. Plaintiff began treating with Douglas Burch, D.C. on referral from Dr. King on March 21, 2001. Dr. Burch discovered that plaintiff had muscle spasms during the palpatory examination, especially in the right trapezius muscle under the shoulder blade, and determined that the objective findings of muscle spasms in the suboccipital region, in the sternocleidomastoid musculature, in the scalenes and in the trapezius muscle were consistent with plaintiff's subjective complaints of back pain, neck pain, right shoulder pain and headaches. Dr. Burch testified during his deposition that muscle spasms are quite typical of trauma; however, bursitis does not cause muscle spasm in the trapezius muscle. Dr. Burch further testified that the trapezius muscle can go into spasm as a result of a shoulder injury.
15. Dr. Burch's clinical impression was that plaintiff suffered from posttraumatic cervical sprain/strain injury, thoracic sprain/strain injury and segmental dysfunction of his cervical and thoracic spine. Dr. Burch testified during his deposition that segmental dysfunction occurs in an injury when the normal movement of the vertebra to pump fluid into the intervertebral discs is stopped by spasm causing the disc to slowly deteriorate. If not corrected, the disc ultimately may crack apart as it dries up. Dr. Burch opined that plaintiff's fall from the truck onto concrete was significant enough trauma to induce segmental dysfunction and lead to nerve root compromise, degenerative disc changes and other conditions. Plaintiff's joint dysfunction was progressive and moved down plaintiff's back by April 2002, and other joint dysfunction was still present. The advancement of plaintiff's degenerative disc changes and progressive joint dysfunction was caused by his January 19, 2001 fall.
16. An MRI of plaintiff's cervical spine performed on March 23, 2001 revealed a bulging disc present at C5-6. Plaintiff had complaints of bilateral hand numbness shortly following the accident. Dr. Burch said these complaints were caused by plaintiff's cervical spine injury. Dr. King agreed that the cervical spine injury could be a cause of these complaints, but further evaluation was necessary.
17. Due to the right shoulder impingement and hypertrophy of the right acromioclavicular joint, an acromioplasty and resection of the acromiclavicular joint with manipulation under anesthesia was performed by Dr. King on April 26, 2001. Plaintiff was then referred to physical therapy at Anson Community Hospital on May 2, 2001 for range of motion treatment to his right shoulder. Dr. King testified that surgery is not performed on a typical bursitis case and that plaintiff's surgery was the result of either the aggravation of a preexisting condition to the right shoulder or the direct result of his fall on January 19, 2001. Dr. King further testified that he would not have operated on plaintiff's right shoulder had plaintiff not had the fall.
18. Due to continuing parasthesias in the upper extremity, plaintiff was referred to the Charlotte Institute of Rehabilitation for electromyography and nerve conduction studies, which were performed June 5, 2001. The assessment was that this was an abnormal study with electrical evidence of mild median sensory motor neuropathy at the wrist. Plaintiff's intermittent parasthesias in both hands persisted and in November 2001, Dr. King diagnosed this as tardyulnar palsy, which was especially prevalent on the left. In his deposition, Dr. King confirmed that the March 2001 MRI of plaintiff's cervical spine revealed a bulging disc. Dr. King's medical records of plaintiff's January 24, 2001 visit include his reports of left arm pain and numbness. Dr. King further confirmed that the ulnar nerve travels through the cervical spine, through the shoulder and down into the hands and that the ulnar symptoms could be related to the falling and landing on the left side. Dr. King indicated that further evaluation of hand symptoms would be required before an accurate opinion could be rendered regarding additional treatment, disability ratings and causation.
19. Defendant-employer never offered plaintiff any light duty work. Plaintiff has not returned to work with defendant-employer in any capacity since his January 19, 2001 injury. Since plaintiff's claim was denied by defendants, vocational rehabilitation was not offered to plaintiff either.
20. Dr. Burch testified that it would be impossible for plaintiff to sit for long periods of time or to drive a truck much less to get in and out of a truck. Dr. Burch explained that when driving one sits with a flexed back with arms outstretched which puts a great deal of stress on shoulders and musculature of the trapezius muscles. Dr. Burch also explained that when sitting, one's back is in a flexed position. Dr. Burch is of the opinion that plaintiff has significant ligamentous damage and scarring within his muscles. Between August 2001 and April 2002, plaintiff has become progressively worse. Plaintiff's condition has progressed toward his low back with the direct consequence of the expected worsening of condition because of the progressive nature of the injury. Dr. Burch feels plaintiff's conditions will continue to progress.
21. Plaintiff sustained an injury by accident during the course and scope of his employment with defendant-employer on January 19, 2001, that has rendered him totally disabled since that time.
22. Plaintiff has sustained permanent injury to his neck and back and supporting structure and shoulders that are related to his compensable injury by accident. Plaintiff is restricted in sitting, lifting, using his arms outstretched, and grip strength and cannot reach overhead with his right arm per Dr. Burch. According to the restrictions imposed by Dr. King and according to the testimony and medical opinion of Dr. Burch, plaintiff is unable to operate a tractor trailer in terms of driving, getting in and out, loading and unloading, or doing other activities associated with being a tractor trailer operator. In order to most accurately assess plaintiff's work restrictions, a functional capacity evaluation is necessary.
23. Plaintiff has reached maximum medical improvement with regard to his neck, back, and shoulder injuries; however, his back injuries are progressing. Further evaluation of plaintiff's neck, back, and shoulders is required to determine the degree of permanent impairment under the workers' compensation guidelines. At this time, there is insufficient evidence of record for the Full Commission to make findings regarding whether or not plaintiff's hand symptoms are related to his compensable injury by accident.
24. Plaintiff made an adequate, sufficient effort to find employment within his work restrictions, but was unsuccessful in doing so. Plaintiff submitted applications for various truck driver positions and maintained a job search record even though he did not believe he was capable of performing such work.
 ***********
Based upon the findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff suffered a compensable injury by accident on January 19, 2001 to his right shoulder when he fell out the back door of his tractor trailer. N.C.G.S. § 97-2(6).
2. Plaintiff is entitled to receive temporary total disability compensation beginning January 20, 2001 and continuing until plaintiff returns to work at the same or greater average weekly wage than he was receiving prior to his injury by accident or further Order of the Commission. N.C.G.S. § 97-29.
3. Plaintiff is entitled to receive permanent partial disability compensation for permanent impairment to his neck, back, and shoulders related to his compensable injury by accident. The Full Commission reserves this issue for later ruling should the parties be unable to agree on the degree of plaintiff's permanent partial impairments of his neck, back, and shoulders following further evaluation of his condition. N.C.G.S. § 97-30.
4. Plaintiff is entitled to further evaluation as to whether or not his hand symptoms are causally related to his compensable injury by accident and assessment of whether or not he has sustained any permanent partial disability to his hands. The Full Commission reserves this issue for later ruling should the parties be unable to agree on the issues of causation and/or permanent partial impairment of plaintiff's hands following further evaluation of his condition. N.C.G.S. § 97-30.
5. Defendants provided no evidence that it offered plaintiff suitable employment "taking into account both his physical and vocational limitations" Kennedy v. Duke University Medical Center, 101 N.C. App. 24,398 S.E.2d 677 (1990). Plaintiff has made a reasonable effort to return to work, but needs vocational assistance and more detailed description of his work restrictions; therefore, plaintiff is entitled to a Functional Capacity Evaluation. The Full Commission reserves these issues for later ruling if the parties are unable to agree on plaintiff's permanent work restrictions and/or vocational rehabilitation issues.
6. Plaintiff is entitled to receive compensation for all medical treatment received related to his compensable injury by accident required to effect a cure, give relief, or lessen the period of his disability. N.C.G.S. § 97-25.
7. Defendants are entitled to a credit for all compensation paid to plaintiff between January 20, 2001 and March 16, 2001 pursuant to the Form 63. N.C.G.S. § 97-42.
 ***********
Based on the foregoing findings of fact and conclusions of Law, the Full Commission reverses the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Defendants shall pay to plaintiff temporary total disability compensation in the amount of $481.17 per week beginning January 20, 2001 and continuing until plaintiff returns to work at the same or greater average weekly wage that he was receiving prior to his injury by accident or further Order of the Commission. The amount that has accrued shall be paid to plaintiff in a lump sum subject to a credit for benefits paid by defendants pursuant to the Form 63 through March 16, 2001 and the attorney's fee approved below.
2. Defendants shall pay to plaintiff permanent partial disability compensation in an amount to be determined following further evaluation of plaintiff's permanent impairments should plaintiff elect this as his most favorable remedy. If applicable, this amount shall be paid to plaintiff in a lump sum subject to an attorney's fee approved below.
3. Defendants shall pay for further diagnostic studies and evaluations necessary for Dr. Joseph J. King to establish plaintiff's permanent partial disability ratings for his neck, back, and shoulders.
4. Defendants shall pay for an evaluation with Dr. Warren Burrows with Carolina Hand Center in Charlotte, North Carolina to determine whether or not plaintiff's hand symptoms are causally related to his compensable injury by accident and assess a permanent partial impairment rating for plaintiff's hands.
5. Defendants shall pay for all medical treatment related to plaintiff's compensable injury by accident designed to effect a cure, give relief, or lessen plaintiff's period of disability.
6. Defendants shall pay for a Functional Capacity Evaluation to be performed by Dr. Joseph J. King to establish plaintiff's permanent work restrictions.
7. Defendants shall provide vocational rehabilitation services to plaintiff if the results of his Functional Capacity Evaluation provide that such services would serve to lessen plaintiff's period of disability.
8. A reasonable attorney's fee in the amount of twenty-five percent (25%) of benefits awarded to plaintiff is hereby approved for plaintiff's counsel. Defendants shall pay the amount that has accrued directly to plaintiff's counsel in a lump sum and thereafter plaintiff's counsel shall receive every fourth check.
9. Defendants shall pay the costs due the Commission.
This the ___ day of March 2003.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER